**In re ARCHITECTURAL MILLWORK OF VIRGINIA, INC., Debtor.**

Bankruptcy No. 98–00942.

United States Bankruptcy Court,
W.D. Virginia,
Lynchburg Division.

Oct. 9, 1998.

Jeremy S. Friedberg, Baltimore, MD, for Associates Leasing, Inc.

Paul J. Feinman, Lynchburg, VA, for Debtor.

## MEMORANDUM OPINION

WILLIAM E. ANDERSON, Bankruptcy Judge.

The matter before the Court in this Chapter 11 case is the motion of Associates Leasing, Inc., ("Associates") to compel assumption or rejection of leases. A few weeks after that matter was heard and taken under advisement, Associates brought a motion for the payment of leases before the Court. That matter was also taken under advisement at the conclusion of its hearing.

As the outcome of the second motion is tied to the central issue of the first motion regarding whether the transactions in question were, in fact, leases, the Court dispenses with both matters in this memorandum opinion.

### Facts

The debtor filed its Chapter 11 Bankruptcy petition on March 25, 1998. The debtor remains in possession of its assets and is operating its business as a debtor-in-possession pursuant to Bankruptcy Code § 1107.

Prior to the filing date, Associates and the debtor entered into an agreement on May 16, 1996, entitled Truck Lease Agreement, providing for the lease of a 1995 Freightliner

vehicle (the "Freightliner agreement").[1] Then on August 2, 1996, River Ridge Supply and the debtor entered into a Conditional Sales Contract regarding a Komatsu forklift (the "Komatsu agreement"). Contemporaneous with the execution of the Komatsu agreement, River Ridge Supply assigned to Associates all of its rights under the agreement.

At the May 16, 1998, hearing on Associates's motion to compel assumption or rejection of leases, the parties put on evidence in support of their positions. Based on the testimony and evidence from the hearing, the Court makes the following additional findings regarding the relevant circumstances surrounding these agreements.

The debtor entered into the Freightliner agreement after Darryl Motley, on behalf of the debtor, visited the Virginia Truck Center ("V.T.C.") in Roanoke, Virginia. Mr. Motley testified that he decided to purchase a new vehicle while at V.T.C. after concluding that it would not be economically feasible to repair his previous truck.

After Mr. Motley selected the Freightliner, he then negotiated a purchase price with V.T.C. Next, Mr. Motley selected and negotiated a price for the appropriate van body to be attached to the Freightliner. Since Mr. Motley elected to finance the vehicle, he met with the credit department at V.T.C. According to Mr. Motley's testimony, it was at that time that he first considered financing the vehicle with a leasing company instead of a bank because he felt that he could more easily obtain credit. The amount that had to be financed, after subtracting the trade in value of the debtor's previous vehicle, is shown on the Freightliner agreement as capitalized costs totaling $38,500.00.

Mr. Motley also testified that the circumstances surrounding the execution of the Komatsu agreement with River Ridge Supply paralleled those of the Freightliner agreement. Specifically, the evidence indicated that the debtor selected the goods without input from Associates, and Associates never

inspected the goods before or after the agreements.

At the conclusion of the hearing, Associates argued that the debtor should be compelled to act pursuant to Bankruptcy Code § 365, and the debtor, in turn, claimed § 365 does not apply because the transactions were not true leases. Thereafter, the parties submitted memoranda for the Court's consideration.

**Discussion**

■ The Court's ruling on Associates's motion turns on whether the agreements in question are true leases or, in fact, security agreements, for purposes of Bankruptcy Code § 365. Such a determination is made by reference to state law. *In re Yarbrough,* 211 B.R. 654, 656 (Bankr.W.D.Tenn.1997); *In re National Traveler,* 110 B.R. 619, 620 (Bankr.M.D.Ga.1990). Accordingly, a careful analysis of the relevant state code provisions is in order.

Virginia has adopted the Uniform Commercial Code. Of particular importance to this case, the first paragraph of Virginia Code § 8.1–201(37) reads as follows.

> (37) 1. "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) *an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*

Although this first paragraph of the statute requires the Court to examine the facts of each case in characterizing a transaction, "[t]he plain language of the statute creates a security interest in property as a matter of

---

1. As discussed later in this opinion, the Court looks beyond the face of the agreement which states the vehicle is to be "leased" in order to determine if this agreement is, in fact, a true lease or a disguised security agreement. The

labeling of the agreement as a "lease" and referring to the parties as "lessor" and "lessee" in and of themselves are not controlling. *In re Owen,* 221 B.R. 56, 62 (Bankr.N.D.N.Y.1998).

law if the parties' contract allows the lessee to become the owner of the leased property for nominal or no additional consideration upon compliance with the terms of the lease." *C.F. Garcia Enterprises v. Enterprise Ford Tractor,* 253 Va. 104, 107, 480 S.E.2d 497 (1997). As discussed later in this opinion, the second paragraph of Virginia Code § 8.1–201(37) restates this same proposition.

■ Applying this rule to the two agreements involved in this case produces mixed results. The Komatsu agreement clearly provides for the option to purchase the forklift for one dollar after all scheduled payments are completed. Consequently, the Court finds that this transaction was, in fact, a security agreement for purposes of Bankruptcy Code § 365 and dispenses with that portion of Associates's motion. Although this conclusion is well supported by the law, the Court also notes that neither the evidence submitted by Associates nor the arguments of its memoranda refute or even seriously address the characterization of the Komatsu agreement. Associates has focused on the more difficult issue of the Freightliner agreement.

■ Although the Freightliner agreement does not provide an option to purchase the equipment for one dollar, the debtor nonetheless argues that the purchase option is for nominal consideration. Associates, in turn, asserts that no option to purchase even exists in the Freightliner agreement. Instead, Associates argues that the agreement includes a final adjustment clause in paragraph 8 that requires the sale of the property at the end of the lease. If the proceeds are more than the residual value set forth in the agreement, then a credit is given to the debtor. If, however, the sale proceeds are less than the residual value, the debtor is charged the

difference. *See* May 16, 1996, *Truck Lease Agreement* at paragraph 8.

Contrary to Associates suggestion, however, the Court treats the final adjustment clause in this case as simply an option for the debtor to purchase the equipment at the end of the lease at the price set by the residual value, $9,625.00. Not only is this a logical conclusion under the circumstances of this case, but Associates's own representative, Robert Davis, testified at the hearing in this matter that Associates would release title to the debtor, without the need for an actual public or private sale, if the debtor offered the residual value at the conclusion of the lease term. The result, of course, is that an option to purchase is created.

The characterization of the final adjustment clause as an option to purchase, however, is only a step in the process of determining whether the Freightliner agreement is a disguised security agreement and not a true lease. The Court returns to the remaining provisions of Virginia Code § 8.1–201(37) to resolve this question.[2]

2. Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) The lessee has an option to renew the lease for the remaining economic life

---

**2.** The Court has reviewed all relevant cases suggested by the parties for guidance. Unfortunately, the Court finds that the majority of the earlier cases interpreting the Uniform Commercial Code ("U.C.C.") provisions have produced confusing results. The drafters of the U.C.C. evidently reached the same conclusion and responded with amendments to the definition of security interest. Virginia joined the ranks of other states when it adopted those changes into law effective January

1, 1992. As a consequence, there are few helpful cases interpreting these extensive amendments which added paragraphs 2, 3, and 4 to the definition that the Court is reviewing for this decision. Without an abundance of guidance from other decisions analyzing the recent amendments to the U.C.C., the Court has primarily relied upon its own interpretation of the statutory amendments to the definition.

of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

This section, paragraph 2 of the definition of a security agreement, again instructs the Court to analyze these situations on a case by case basis. Next, the code section sets forth several situations that conclusively indicate a security agreement. As conceded by the debtor, the relevant portions of this statute are found in the main body of paragraph two and in subsection (d). Under this analysis, if (i) the debtor cannot avoid paying Associates the value of the payments due under the lease, and (ii) the debtor can become the owner of the Freightliner for nominal or no consideration upon compliance with the lease terms, then the transaction creates a security interest.

The first of these two conditions exists in this case. While the debtor could terminate the lease early, it cannot avoid or terminate the obligation to pay Associates the value of the consideration due under the agreement, whether payable at the natural end of the lease or upon earlier termination. The Court agrees with the analysis of the debtor on this point as outlined in its initial memorandum. *See Initial Brief Debtor* at 10 and 11.[3] The Court finds that the Freightliner agreement requires payment to Associates of the present value, upon early termination, of exactly what it would be paid upon the natural termi-

nation of the lease. Consequently, the condition outlined in the main body of paragraph 2 of Bankruptcy Code § 8.1–201(37) is met in that the debtor could not terminate the obligation to pay the consideration due to Associates under the Freightliner agreement.

Having satisfied the first condition of paragraph 2, the Court looks to the second condition. If any of the four criteria detailed in the subsections (a) through (d) are also met, then the Freightliner agreement is not a true lease. The debtor, of course, asserts that subsection (d) is satisfied. Associates, in contrast, strongly contends that the residual value purchase price of $9625.00 may not be characterized as nominal consideration under subsection (d).

■ The Court sides with Associates and finds that this option to purchase for the residual value is not, in fact, for no consideration or for nominal consideration. Although the Court declines to speculate on where the line would be drawn for what constitutes nominal consideration, clearly $9,625.00 does not qualify as such, particularly in light of the agreement's capitalized cost of only $38,-500.00. Furthermore, the testimony of both parties indicates that the $9,625.00 residual value was a fair estimate, when made at the time the agreement was executed, of the vehicle's value at the conclusion of the lease payments. Consequently, it is not clear from the evidence before the Court that the parties expected for the debtor to recognize much, if any, equity in the vehicle. Nor is it clear that the only economically sensible course for the debtor would be to exercise the option to purchase the vehicle. *In re*

---

**3.** To paraphrase the debtor's argument, the debtor's obligation is to pay all monthly payments, plus the residual value of $9,625.00. If the debtor pays the $9,625.00 in cash at the conclusion of the monthly payments, then Associates would turn over the title to the vehicle. If no such cash payment were made, then Associates would sell the vehicle. If the sale brought more than the $9,625.00 owed by the debtor, then the excess would be returned to the debtor. If the sale brought less, then the debtor would owe the difference to Associates. Thus the agreement ensures that Associates will be paid all the monthly payments plus $9,625.00.

Now consider what must be paid if the debtor terminated the lease early. After meeting the technical requirements for lease termination in paragraph 3 of the agreement, the debtor would be required to pay the total of: (i) the full amount of any past due payments, (ii) the present value of any future, unaccrued monthly payments, plus (iii) the present value of the 9,625.00. Again, the same adjustments are made after the sale of the vehicle. Clearly, the agreement requires payment to Associates of the present value, upon early termination, of exactly what it would be paid upon the natural conclusion of the lease. Consequently, the debtor cannot terminate the *obligation* to pay Associates the value of the consideration under the lease.

*Dunn Brothers, Incorporated,* 16 B.R. 42, 45 (Bankr.W.D.Va.1981) (describing the economic realities test for determining if a sum is nominal by questioning whether the option is set at such an attractive price that the only sensible course for the lessee is to take it). As a result, the Court finds that the option price in this case is not nominal. *Id.; See also In re Aspen Impressions, Inc.,* 94 B.R. 861, 865 (Bankr.E.D.Pa.1989) ("The more nominal the purchase option ... the more likely is the conclusion that the lease was really one intended to accomplish the transfer of a title interest.").

■ The fact that the transaction in question does not clearly fall under any of the bright line tests for a security agreement outlined in paragraph 2 of Virginia Code § 8.1–201(37) does not conclusively determine that the Freightliner agreement is a true lease. It is simply another factor that the court must consider as it carefully analyzes all of the facts of this case to make its decision. For further guidance, the Court looks to paragraph 3 of Virginia Code § 8.1–201(37).

3. A transaction does not create a security interest merely because it provides that:

(a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(b) The lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

(c) The lessee has an option to renew the lease or to become the owner of the goods;

(d) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

■ Although this code section states that the existence of any one of these factors alone does not create a security interest, the Court has considered each of them in order to decide whether the weight of evidence in this case requires a determination that the transaction was a true lease or a security agreement. Of the paragraph 3 factors, subsections (b) and (c) apply in that the debtor assumed the risk of loss and insured the vehicle, the debtor paid taxes on the vehicle, the debtor has paid for all maintenance on the vehicle, and the debtor has the option to purchase the vehicle. In contrast, Associates strongly asserts that factors under subsection (b), such as the debtor's responsibility for taxes, registration fees, and insurance, are not inconsistent with a true lease. *In re Zaleha,* 159 B.R. 581, 584 (Bankr.D.Idaho 1993).

The Court weighs less heavily the factors emphasized by the debtor. As stated in the commentary to the amended U.C.C. definition of security interest, "courts have relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, are as applicable to true leases as to security interests." *See Official Comment* Virginia Code § 8.1–201(37).

The Court finds many of the subsection (b) factors to be as applicable to true leases as to security interests and generally agrees with the language of Judge Clarkson in *Basic Leasing, Inc. v. Paccar, Inc.:* "It makes sense that a lessee would provide insurance on the property while in possession of it under a lease; it seems perfectly reasonable for a lessee to agree to undertake some of the risks of loss or damage while the lessee enjoys possession and use of the property. The same holds true for taxes and maintenance." 1991 WL 117412 (D.N.J.).

As an additional argument, Associates urges the Court's consideration of another relatively new statute enacted in 1991. Virginia Code § 46.2–640.1 states:

Notwithstanding any other provision of law, in the case of motor vehicles, trailers or semi-trailers, a transaction does not create a sale or security interest merely because it provides that the rental price is permitted or required to be adjusted under the agreement either upward or downward by reference to the amount realized upon sale or other disposition of the motor vehicle or trailer.

The Court is unwilling to fully embrace Associates's argument that the Virginia legislature's intent was to place its "unequivocal seal of approval" on leases with final adjustment clauses such as the Freightliner agreement. The Court does, however, note that this statute permits agreements, other than secured transactions, to include language similar to the final adjustment clause of the Freightliner agreement.

Of greatest importance to the Court in making this decision, after exhausting, to no avail, the statutory tests outlined in paragraphs 1 and 2 of Virginia Code § 8.1–201(37), are factors such as whether the vehicle can be purchased for nominal consideration and the anticipated amount of the lessee's equity in vehicle. *In re Bumgardner,* 183 B.R. 224, 228 (Bankr.D.Idaho 1995); *See also Amvest Funding Co. v. Rex Group, Inc.,* 80 B.R. 774, 780 (Bankr.W.D.Va.1987) ("Any creation of equity in the lessee has been held to be one of the distinctive characteristics of a lease intended for security.").

These factors are intertwined. "If a lease contains an option to purchase for no or nominal consideration ..., it suggests that the lessor does not care, in an economic sense, whether or not the option is exercised." *In re Zaleha,* 159 B.R. 581, 585 (Bankr.D.Idaho 1993). Likewise, if the lessee develops equity in the leased property because the purchase price is low relative to the option price, then the only sensible decision economically for the lessee is to exercise the option. In such case, the lessor did not likely expect the return of the leased goods. *Id.*

Due to the final adjustment clause in paragraph 8 of the Freightliner agreement, the debtor in this case theoretically has the opportunity to build up equity in the vehicle if its value can be maintained over the lease term at an amount higher than the $9,625.00 option price. The Court's concern, however, is that the evidence indicates that the parties did not expect much, if any, equity to actually accrue for the benefit of the debtor in this transaction. *In re Aspen Impressions, Inc.,* 94 B.R. 861, 868 (Bankr.E.D.Pa.1989).

As noted previously, the parties' testimony indicated that the $9,625.00 residual value was a fair estimate, when made at the time the agreement was executed, of the vehicle's anticipated value at the conclusion of the lease payments. Again, the Court does not find the resulting option price of $9,625.00 to be nominal consideration under these circumstances. Furthermore, the Court finds that little, if any, equity was anticipated by the parties.

After analyzing the Freightliner agreement and weighing all of the facts and arguments presented by the parties, the Court finds that the Freightliner agreement is a true lease. The Freightliner agreement transferred the right to possession and use of a vehicle to the debtor for a term. The lease included an option to purchase the vehicle; however, that option was for more than just nominal consideration. The equity, if any, created in the lessee in this case is minimal and is therefore of limited significance to the debtor's argument that this lease should be considered as a security agreement.

## Conclusion

For the reasons set forth above, Associates's Motion to Compel the Assumption or Rejection of Leases is denied with respect to the Komatsu agreement and granted with respect to the Freightliner agreement. In addition, based on the Court's characterizations of the agreements in question, Associates's second Motion for Payments of Leases is granted with respect to the Freightliner agreement and denied with respect to the Komatsu agreement.